**KILPATRICK TOWNSEND & STOCKTON LLP**
H. Forrest Flemming, III
1114 Avenue of the Americas
New York, New York 10036-7703
Telephone:  (212) 775-8845
fflemming@kilpatricktownsend.com

Dennis L. Wilson (to be admitted *pro hac vice*)
1801 Century Park East, Suite 2300
Los Angeles, California 90067
Telephone: (310) 777-3740
DWilson@kilpatricktownsend.com

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SPIKE CABLE NETWORKS INC., <br><br>            Plaintiff, <br><br>      v. <br><br> YELLOWSTONE MERCH and SAMSON CHRISTOPHER, <br><br>            Defendants. | 21 Civ. _____ <br><br> **COMPLAINT** |

Plaintiff Spike Cable Networks Inc. states the following for its Complaint against Defendants Yellowstone Merch and Samson Christopher.

<u>**SUMMARY OF THE ACTION**</u>

1.      Plaintiff Spike Cable Networks Inc. (hereinafter the "Network"), known to consumers as "Paramount Network," brings this action to put a stop to Defendants' use of the Network's intellectual property to deceive consumers into believing that Defendants' merchandise is actually authorized or approved by the Network.

2.      The Network is a well-known cable TV network home to famous series like LIP SYNC BATTLE, INK MASTER, and BAR RESCUE.

3.      One of the Network's most popular series is the critically acclaimed drama

YELLOWSTONE, starring Kevin Costner, Kelly Reilly, Cole Hauser, Luke Grimes, and Wes

Bentley (the "Series").



 

4. YELLOWSTONE has been a tremendous success for the Network, with its Season 1 premiere on June 20, 2018, drawing more than 4.8 million viewers—at the time, the largest ever for the network—and its Season 3 premiere on June 21, 2020, drawing more than 7 million viewers.

5. The Network owns federal trademark registrations for the marks

**YELLOWSTONE** and Y and common law rights in the YELLOWSTONE word mark (the "Yellowstone Marks"), as well as federal copyright registrations for every episode in the Series (the "Works").

6. On January 7, 2021, in a bad-faith attempt to capitalize on the success of the Series and deceive its loyal fan base, Defendants registered the domain name <YellowstoneMerch.com> (the "Yellowstone Merch Domain") to host an e-commerce website that sells "replica" products that Defendants claim are worn by characters in the Series, which bear the Yellowstone Marks or are offered under the Series' character names and the names of the Series' cast (the "Yellowstone Merch Website," pictured below).

3





7.      More specifically, Defendants displayed dozens of images and other copyrighted materials from the Series on their website, together with the Series' character names and the names of the Series' cast (as detailed in Paragraphs 25-27 below)  to deceive consumers into believing that Defendants are affiliated with, or authorized by, the Network and/or the Series, which is not the case.

8.      To prevent further deception of the public, the Network contacted Defendant Yellowstone Merch in April 2021 demanding that it cease its infringing activities. After many delays, Defendant and Yellowstone Merch CEO Samson Christopher agreed to comply, and he oversaw the removal of some of the copyrighted content on the Yellowstone Merch Website.

9.      A few weeks later, however, Defendants reinstated the previously-removed content and cut off all communications with the Network.

10.      Then, on June 28, 2021, Defendants launched another website, this time at <YellowstoneOutfits.com> (the "Yellowstone Outfits Domain," and together with the Yellowstone Merch Domain, the "Infringing Domains"), which they have since used for an e-commerce website virtually identical to the one challenged by the Network (the "Yellowstone Outfits Website," and together with the Yellowstone Merch Website, the "Infringing Websites").

11.      The Network therefore brings this action for trademark infringement and unfair competition under the Trademark Act of 1946, 15 U.S.C. §§ 1051 *et seq.* (the "Lanham Act") and the common law of New York; injury to business reputation and dilution under N.Y. Gen. Bus. Law § 360-*l*; copyright infringement under the Copyright Act of 1976, 17 U.S.C. §§ 101 *et seq.* (the "Copyright Act"); and bad faith registration of domain name and cybersquatting under the Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d) (the "ACPA").

12.     Among other relief, the Network asks the Court to: (a) permanently enjoin Defendants and all those acting in concert with them from using the Yellowstone Marks in any way, or from copying or displaying the Works or any derivative work in any way, without the prior, written consent of the Network; (b) award the Network statutory damages for Defendants' willful copyright infringement and bad faith registration of the Infringing Domains; (c) order Defendants to transfer the Infringing Domain names to the Network; (d) award the Network trebled monetary damages; (e) require Defendants to disgorge all of their profits from sales of infringing merchandise, trebled; and (f) award the Network punitive damages, attorneys' fees, and costs.

## PARTIES

13.     Plaintiff Spike Cable Networks Inc. (the "Network"), known to consumers as Paramount Network, is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 345 Hudson Street, New York, NY 10014.

14.     On information and belief, Yellowstone Merch is the fictitious name of a corporation with its principal place of business at 47 W. 13th Street, New York, New York 10011.

15.     On information and belief, Defendant Samson Christopher is a natural person domiciled and residing in the State of New York.

## JURISDICTION AND VENUE

16.     The Court has subject matter jurisdiction over the Network's federal claims under 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331 and 1338. The Court has subject matter jurisdiction over the Network's state law claims pursuant to 28 U.S.C. §§ 1338 and 1367.

17.     The Court has personal jurisdiction over Defendant Yellowstone Merch because, on information and belief, Yellowstone Merch: (a) has its principal place of business in the State of New York; (b) transacts and conducts business within the State of New York to such an extent that it is at home in the State; and (c) purposefully availed itself of the laws of New York by targeting the conduct giving rise to the Network's claims at the State.

18.     The Court has personal jurisdiction over Defendant Samson Christopher because, on information and belief, Mr. Christopher: (a) is a citizen of the State of New York; and (b) purposefully availed himself of the laws of New York by directing his company Yellowstone Merch to target the conduct giving rise to the Network's claims at the State.

19.     Venue is proper in proper in this district pursuant to 28 U.S.C. §§ 1391(b)(1), (b)(2), and (c)(2), as well as 1400(a), because Defendants reside or may be found in this district, and because a substantial part of the events giving rise to the Network's claims occurred in this district.

## FACTS COMMON TO ALL CLAIMS FOR RELIEF

**A.      Plaintiff and its YELLOWSTONE Television Series**

20.     The Network is a wholly-owned subsidiary of ViacomCBS Inc. ("ViacomCBS"), a premier global media company that, through subsidiaries like the Network, has for many years developed, created, and provided entertainment content, services, and related branded products.

21.     ViacomCBS's entertainment services reach approximately 4.4 billion cumulative television subscribers in nearly 200 countries, with more than 300 locally programmed and operated television channels.

22.     For many years, the Network has created and distributed entertainment programs across various media, including television and various digital platforms.

7

23.     One of the most popular entertainment properties created and distributed by the Network is the dramatic television series YELLOWSTONE.

24.     The Series is available to stream on the Paramount Network website and is available to purchase and download on various digital platforms, including Amazon Prime and Peacock.

25.     YELLOWSTONE is a modern-day Western that follows the Dutton family, led by patriarch John Dutton (played by Kevin Costner). The Duttons control the largest contiguous ranch in the U.S. and must contend with constant attacks by land developers and others.



26.     Kelly Reilly portrays John's daughter Beth Dutton, a highly educated and intelligent financier, and Cole Hauser plays Rip Wheeler, Beth's love interest and John's right-hand man.




27.     Luke Grimes portrays John's once-estranged son Kayce Dutton, a former US Navy SEAL. Wes Bentley plays John's other surviving son Jamie Dutton, a Harvard-educated attorney who helps the family on legal issues.




28.     The Series premiered on June 20, 2018, to more than 4.8 million viewers—at the time, the largest premiere audience in the Network's history.

29.     The original airings of every episode in Seasons 1 and 2 of YELLOWSTONE ranked in at least the top 10 entertainment telecasts on ad-supported cable for that day, with many episodes earning the number one ranking.

30.     The June 21, 2020, premiere of Season 3 attracted an amazing 7 million viewers, and with at least 6 million viewers of each subsequent episode, YELLOWSTONE was 2020's most watched cable series.

31.     In connection with the Series, related marketing and promotional materials, and sales of various merchandise, the Network uses the word mark YELLOWSTONE, both standing alone and with a Y design (the "Y Logo"), as shown below:



The above mark, along with the Y Logo and YELLOWSTONE word mark, are collectively referred to as the "Yellowstone Marks."

32.     On November 18, 2019, the Network applied to register the mark with the United States Patent & Trademark Office (the "USPTO") in International Class 41. On April 28, 2020, the USPTO issued Reg. No. 6,042,705 to the Network. The Certificate of Registration for the foregoing mark, as well as documents showing that the mark is valid and subsisting, are attached collectively as **Exhibit 1**.

33.     On October 17, 2019, the Network applied to register the mark ⅄ with the USPTO in International Class 25 for "footwear." On May 12, 2020, the USPTO issued Reg. No. 6,053,377 to the Network. The Certificate of Registration for the foregoing mark (together with the registration for **YELLOWSTONE**, the "Trademark Registrations"), as well as documents showing that the mark is valid and subsisting, are attached collectively as **Exhibit 2**.

34.     On October 17, 2019, the Network applied to register the mark ⅄ with the USPTO in International Class 25, for clothing goods, such as t-shirts, vests, jackets, and the like. The application for the foregoing mark, bearing App. No. 88658527 (the "Application"), was published by the USPTO on February 25, 2020, and was not opposed. Documents reflecting the foregoing, as well as documents showing that the Application remains pending, are attached collectively as **Exhibit 3**.

35.     The Yellowstone Marks are non-functional and distinctive as to the goods and services in connection with which the Network uses them.

36.     The Network has spent millions of dollars advertising, promoting, and marketing the Yellowstone Marks and the Series in the United States.

37.     As a result of the Network's efforts, consumers have come to associate the Yellowstone Marks exclusively with the Network and the Series.

38.     In 2020, the Network capitalized on the success of the Series and its goodwill in the Yellowstone Marks by offering, and licensing others to offer, merchandise branded with the Yellowstone Marks, such as T-shirts, vests, and other apparel and accessories.




39.     Official Yellowstone-branded merchandise is currently available at the Network's <YellowstoneTVShop.com> website, as well as other locations.

40.     Sales of Yellowstone-branded merchandise, and associated licensing fees and royalties, have proven lucrative for the Network, such that the company's exclusive rights to use or license the Yellowstone Marks are extremely valuable.

41.     The Yellowstone Marks and the Series have also attracted significant unsolicited media attention from national and local outlets. Yellowstone has been covered in numerous articles published by *The New York Times*, *The New Yorker*, *New York Magazine*, *The Washington Post*, *Entertainment Weekly*, *CNN*, and *NPR*, to name a few. Representative examples of unsolicited media attention are attached collectively as **Exhibit 4**.

42.     In addition to being a clear commercial success, the Series has also been a critical success. For example, Season 3 of the Series earned a 100% critic score on review site Rotten Tomatoes—a season which also earned the Series an Emmy nomination.

43.     Even prior to 2021, due to the Network's significant advertising, marketing, and

12

promotion of the Yellowstone Marks and the Series, as well as extensive unsolicited attention from both consumers and the press, the Yellowstone Marks became well-known in New York and throughout the United States, with consumers viewing the marks as indicators of origin and associating them exclusively with the Network and the Series.

44.    Accordingly, the Yellowstone Marks have considerable conceptual and commercial strength, and the Network has built up and now owns extremely valuable goodwill that is symbolized by them.

**B.    Plaintiff's Copyrights**

45.    Subject to certain preexisting material—namely, preexisting music—each episode of YELLOWSTONE (collectively, the "Works") is a motion picture and an original work of authorship, embodying copyrightable subject matter and subject to the full protection of the copyright laws of the United States.

46.    To the extent necessary, all contractors who contributed to the Works have expressly agreed via signed written instruments that all their contributions to the Works are deemed works made for hire by the Network.

47.    All employees and agents of the Network who contributed to the Works were operating fully within the scope of their employment with the Network.

48.    Through operation of law and/or written instrument, the Network is the author and sole and exclusive owner of all right, title, and interest in and to the copyrights in the Works.

49.    The Network has complied with all requirements and formalities of the Copyright Act with respect to the Works.

50.    The Network has obtained copyright registration certificates from the United States Copyright Office for each of the Works, with effective dates of 2020 or earlier.

Documents identifying the Network's copyright registrations for the Works are attached collectively as **Exhibit 5**.

**C.      Defendants' Bad Faith Infringement of the Network's Intellectual Property**

51.     On information and belief, Defendants registered the Yellowstone Merch Domain on January 7, 2021, and used a privacy service to conceal their identities. A copy of the Whois registration information for the Yellowstone Merch Domain is attached as **Exhibit 6**.

52.     The Yellowstone Merch Domain is confusingly similar to the Yellowstone Marks because it contains only the word "Yellowstone," with the generic term "merch" and the top-level domain ".com," which consumers do not consider as indicators of source.

53.     At the time Defendants registered the Yellowstone Merch Domain, the YELLOWSTONE Series and Marks were distinctive and already widely known among the general public in the United States and associated exclusively with the Network—a fact of which Defendants, on information and belief, were well aware.

54.     The Yellowstone Merch Website demonstrates that Defendants registered and are using the Yellowstone Merch Domain in a bad faith attempt to target the Network, the Series, and its Yellowstone Marks, and to profit from the value of the Yellowstone Marks. Barely a month after registration of the domain, the website displayed numerous copyrighted images and other materials from the Series—like character names John Dutton, Beth Dutton, and Rip Wheeler—and offered for sale products bearing the Yellowstone Marks. An archived capture of the Yellowstone Merch Website as it appeared on February 17, 2021 is attached as **Exhibit 7**.







55.    By April 2021, Defendants' misuse of the Network's intellectual property was even more egregious:



56.      Defendants openly admitted on the Yellowstone Merch Website that they were

intentionally capitalizing on the popularity of the Series and the Network's goodwill in the

Yellowstone Marks, stating: "Yellowstone Fans are going crazy for Yellowstone merchandise . . .

after seeing the incredible series," and "Yellowstone merchandise has been popular and in-demand

among their fans. And they are constantly seeking out Yellowstone Merchandise."

57.    Defendants also admitted on the Yellowstone Merch Website to selling exact

"replicas" of Yellowstone-branded merchandise on their website, which the Network never

authorized Defendants to do.

## About Yellowstone Merchandise

Yellowstone Fans are going crazy for Yellowstone merchandise due to an amazing outfit worn by their favorite celebrities like John Dutton, Rip Wheeler, and Beth Dutton after seeing the incredible series.
Besides in the Yellowstone TV series characters wore extraordinary outfits specially Jackets. Those outfits which incorporate  Jackets, coats and vests are available at Yellowstone merch.com. We provide an amazing collection, when it comes to Yellowstone leather jackets. Cotton, silk, and denim materials are utilized in the manufacturing of these outclass merchandise.

Yellowstonemerch.com likewise has numerous other merchandise persuasive outfits. Other outfits are unique in relation to these due to various styles and colors. Each outfit is stunning. Yellowstone merchandise has been popular and in-demand among their fans. And they are constantly seeking out for Yellowstone Merchandise. We offers a replica of Yellowstone Jackets in premium quality and an outstanding style with color same as the original. We promise provide quality and with every minimal detailing as you have seen in the original. Moreover, the Yellowstone Rip Wheeler Jacket and t-shirt are also available here. As the amazing collection doesn't end here, We also offers a huge quality of classic vests that are designed especially for providing comfort. You are at the perfect place if you are also a fan of classic vest coats.

58.    Defendants further claim to have seven "Best Sellers," each of which is offered under

the Yellowstone Marks and displays copyrighted materials, including  images from the Series and

character names, as shown below.



59.     The Yellowstone Merch Website homepage, "Terms & Conditions," and "Contact

Us" pages each state that the company is located at 47 W. 13th Street, New York, New York 10011.

The Terms & Conditions further state that "The laws of [New York, United States] . . . shall govern

this Terms and Your use of the Service." Copies of the foregoing webpages are attached collectively

as **Exhibit 8**.

18

60.     On April 28, 2021, the Network contacted Yellowstone Merch to demand that the company cease all of its infringing activities, including by removing all copyrighted materials from the Yellowstone Merch Website, ceasing all use of the YELLOWSTONE Marks, and transferring the Yellowstone Merch Domain.

61.     On May 12, 2021, the Network received a response from "Shawn," who identified themselves as "Manager at Yellowstone Merch." Shawn stated that they would send the Network's demand letter "to upper-level management including Yellowstone Merch Founder, CEO, and Directors." The signature block for Shawn's email stated that Yellowstone Merch was located at "47 West 13th Street, New York, NY 10011." A copy of an email chain showing the foregoing email is attached as **Exhibit 9**.

62.     The Network followed up with Shawn several times, and on June 12, 2021, Defendant Samson Christopher emailed back, identifying himself as the CEO of Yellowstone Merch. Mr. Christopher agreed to "remove all the TV Series 'Yellowstone' copyright reserved photos from our website including site banners, product images by this Monday [June 14, 2021]." On June 14, Mr. Christopher stated: "I alerted our team to remove all the images related to your TV series IP and other removal" but would "need 3-4 days to complete." Copies of email chains showing the foregoing emails, which further confirm Yellowstone Merch's New York business address, are collectively attached as **Exhibit 10**.

63.     Defendants then removed some, but not all, copyrighted images from the Yellowstone Merch Website. Defendants also changed their logo from an exact copy of the Network's Y Logo (as seen first immediately below with the stylized Y Logo) to a confusingly similar imitation (as seen next immediately below with a yellow Y):



64.     Despite numerous follow-ups, some of which are attached as **Exhibit 11**, Defendants never again responded to the Network. Instead, Defendants re-posted on their website many of the unauthorized copyrighted images they had previously removed.

65.     On information and belief, Defendants registered the Yellowstone Outfits Domain on March 2, 2021, and used the same privacy service to conceal their identities. A copy of the Whois registration information for the Yellowstone Outfits Domain is attached as **Exhibit 12**.

66.     The Yellowstone Outfits Domain is confusingly similar to the Yellowstone Marks because it contains only the word "Yellowstone," with the generic term "outfits" and the top-level domain ".com," which consumers do not consider as indicators of source.

67.     At the time Defendants registered the Yellowstone Outfits Domain, the YELLOWSTONE Series and Marks were distinctive and already widely known among the general public in the United States and associated exclusively with the Network—a fact of which Defendants, on information and belief, were well aware.

68.     The timing of the launch of the Yellowstone Outfits Website, as well as the website itself, demonstrates that Defendants registered and are using the Infringing Domains in a bad faith attempt to target the Network and its Yellowstone Marks, and to profit from the value of the

Yellowstone Marks.

69.     On information and belief, on approximately June 28, 2021—just two weeks after Defendants agreed to comply with many of the Network's demands—Defendants launched the Yellowstone Outfits Website, which uses an exact copy of the stylized Y Logo and contains the same infringing material originally displayed on the Yellowstone Merch Website. Images from the Yellowstone Outfits Website, as it currently appears, are shown below and in **Exhibit 13**:





**SHOP BY CHARACTER**



JOHN DUTTON



RIP WHEELER



KAYCE DUTTON



BETH DUTTON





# Kevin Costner Yellowstone John Dutton Black Cotton Vest

$219.00 **$149.00**

**Size**

| 3XL | L | M | S | XL | XS | XXL |

| XXS |

- 1 +     ADD TO CART

SKU: YSM-002

Categories: Men, Yellowstone Vests

70.     Ironically, Defendants have stamped the phrase "©YELLOWSTONEOUTFITS" across copyrighted images from the Series that Defendants are using to sell Infringing Products on the Yellowstone Outfits Website, as shown below:

22



## Luke Grimes Yellowstone Kayce Dutton Denim Jacket

$129.00

Size

3XL   L   M   S   XL   XS   XXL

XXS

-   1   +      ADD TO CART

SKU: YSM-039

Categories: Kayce Dutton Yellowstone Merchandise, Men, Yellowstone Jackets

71.     The homepage of the Yellowstone Outfits Website lists an address of 47 W. 13th Street, New York, New York 10011. A copy of that web page is attached as **Exhibit 14**.

72.     Also on June 28, 2021, Defendants created an account on Reddit.com to advertise "Yellowstone Outfits & Merchandise" using a copyrighted image from the Series, stating in one post: "We launch a best leather jackets in USA a very reasonable price and best quality of design. There is a lot of unique design and your favorite actress jackets are also available let's checkout Yellowstone Outfits." A copy of Defendants' posts on Reddit.com are attached as **Exhibit 15**.

73.     On information and belief, Defendants launched the Yellowstone Outfits Website in a bad faith attempt to continue their infringing activities while escaping detection from the Network.

23

74.     Defendants are using marks that are substantially identical, or confusingly similar, to the Yellowstone Marks to advertise, market, promote, offer for sale, and sell products that directly compete with products offered by the Network and its licensees under the Yellowstone Marks (the "Infringing Products").

75.     Defendants are targeting the Infringing Products at the exact same New York and United States consumers at which the Network targets its genuine Yellowstone-branded products: namely, viewers of YELLOWSTONE.

76.     Defendants' conduct is likely to deceive, confuse, and mislead actual and prospective New York and United States purchasers before, during, and/or after purchase into believing that the Infringing Products are manufactured or authorized by, or in some manner associated with, the Network, which they are not.

77.     Defendants have never used the Infringing Domains for any bona fide noncommercial or fair use, whether of the Yellowstone Marks or otherwise. Instead, Defendants have, at all relevant times, used the Infringing Domains to divert consumers from the Network's own Yellowstone-branded e-commerce store to the Infringing Websites.

78.     In light of the Network's clear rights in the Yellowstone Marks, including its federal registrations and pending application, at no time could Defendants have registered or used the Infringing Domains under the reasonable belief that such registration or use constituted fair use or was otherwise lawful.

79.     On information and belief, either Yellowstone Merch or Samson Christopher is the registrant of the Infringing Domains, with the other serving as the registrant's authorized agent.

24

80.     On information and belief, Defendants' conduct has been and continues to be willful, wanton, and in bad faith.

81.     The likelihood of confusion, mistake, and deception engendered by Defendants' misappropriation of the Network's Yellowstone Marks is causing irreparable harm to the Network, the goodwill symbolized by the Yellowstone Marks, and the reputation for quality that they embody.

82.     Defendants' conduct is also confusing, deceiving, and harming the public in New York and throughout the United States.

83.     The foregoing harm is exacerbated by the fact that, on the Infringing Websites and Defendants' associated marketing materials, Defendants have intentionally displayed and reproduced copyrighted images and character names, and derivative works thereof, from the Series (the "Infringing Materials").

84.     On information and belief, Defendants created, displayed, and reproduced the Infringing Materials willfully, and in knowing disregard of the Network's rights, of which Defendants were on notice long before they registered the Infringing Domains.

85.     On information and belief, all of Yellowstone Merch's unlawful conduct has been personally directed and overseen by Samson Christopher, who at all times relevant has been the sole moving force behind Yellowstone Merch's infringing activities.

**FIRST CLAIM FOR RELIEF**
**Federal Trademark Infringement**
**(15 U.S.C. § 1114)**

86.     The Network repeats and incorporates by reference the allegations in the preceding paragraphs.

87.     The Network is the record owner of the Trademark Registrations and has

exclusive rights in the marks covered by those registrations (the "Registered Marks").

88.     Defendants' unauthorized use of confusingly similar imitations of the Registered Marks is likely to cause confusion, deception, and mistake by creating the false and misleading impression that the Infringing Products are manufactured or distributed by the Network, or are associated or connected with the Network, or have the sponsorship, endorsement, or approval of the Network.

89.     Defendants' conduct has caused—and unless enjoined by the Court, will continue to cause—a likelihood of confusion and deception of members of the trade and public, and, additionally, injury to the Network's goodwill and reputation as symbolized by the Registered Marks, for which the Network has no adequate remedy at law.

90.     Defendants' conduct demonstrates a willful, wanton, and malicious intent to trade on the goodwill associated with the Registered Marks to the Network's great and irreparable harm.

91.     The Network is thus entitled to permanent injunctive relief and to recover Defendants' profits, actual damages, enhanced profits and damages, costs, and reasonable attorneys' fees under 15 U.S.C. §§ 1114, 1116, and 1117.

### SECOND CLAIM FOR RELIEF
### Federal Unfair Competition
### (15 U.S.C. § 1125(a))

92.     The Network repeats and incorporates by reference the allegations in the preceding paragraphs.

93.     The Network has extensively and exclusively used the Yellowstone Marks in interstate commerce in the United States since at least as early as 2018.

94.     The Yellowstone Marks became widely-known by the general public and attained

26

secondary meaning before Defendants began their infringing conduct.

95.     The Network owns common law trademark rights in the Yellowstone Marks.

96.     Defendants' unauthorized use of confusingly similar imitations of the Yellowstone Marks is likely to cause confusion, deception, and mistake by creating the false and misleading impression that the Infringing Products are manufactured or distributed by the Network, or are associated or connected with the Network, or have the sponsorship, endorsement, or approval of the Network.

97.     Defendants have made false representations, false descriptions, and false designations of the Infringing Products.

98.     Defendants' conduct has caused—and unless enjoined by the Court, will continue to cause—a likelihood of confusion and deception of members of the trade and public, and, additionally, injury to the Network's goodwill and reputation as symbolized by the Yellowstone Marks, for which the Network has no adequate remedy at law.

99.     Defendants' conduct demonstrates a willful, wanton, and malicious intent to trade on the goodwill associated with the Yellowstone Marks to the Network's great and irreparable harm.

100.    The Network is thus entitled to permanent injunctive relief and to recover Defendants' profits, actual damages, enhanced profits and damages, costs, and reasonable attorneys' fees under 15 U.S.C. §§ 1125(a), 1116, and 1117.

### THIRD CLAIM FOR RELIEF
### Federal Copyright Infringement
### (17 U.S.C. § 501)

101.    The Network repeats and incorporates by reference the allegations in the preceding paragraphs.

102.    The Works are each original works of authorship, and the Network is the sole and exclusive owner of all right, title, and interest in and to the copyrights in the Works.

103.    The Works, as well as images and character names from the Works, have been available on the Internet for years, and Defendants have long had access to the Works.

104.    Images and character names appearing on the Infringing Websites are identical or substantially similar to copyrightable material in the Works.

105.    Without authorization from the Network, Defendants reproduced copyrightable material from the Works, displayed reproductions of copyrightable material from the Works, and created derivative works based on copyrightable material from the Works.

106.    Defendants' conduct has been willful and in knowing disregard of the Network's rights.

107.    The Network is thus entitled to injunctive relief and to recover Defendants' profits, actual damages, statutory damages, costs, and reasonable attorneys' fees under 17 U.S.C. §§ 502, 504(b), and 505.

## FOURTH CLAIM FOR RELIEF
### Federal Bad Faith Registration of Domain Name and Cybersquatting
### (15 U.S.C. § 1125(a))

108.    The Network repeats and incorporates by reference the allegations in the preceding paragraphs.

109.    The Network owns registered trademark rights in the Registered Marks and common law rights in the Yellowstone Marks.

110.    On information and belief, either of the Defendants is the registrant of the Infringing Domains, with the other being an agent of the registrant.

111.    On information and belief, Defendants use the Infringing Domains.

112.    The Infringing Domains are substantially identical to, or confusingly similar to, the YELLOWSTONE word mark and the registered mark Y YELLOWSTONE.

113.    Defendants or their agents registered and are using the Infringing Domains in a bad faith attempt to profit from them.

114.    Defendants' conduct demonstrates a willful, wanton, and malicious intent to trade on and profit from the goodwill associated with the Network's Yellowstone Marks.

115.    Defendants' conduct is causing harm—and unless enjoined by the Court, will continue to cause harm—to the Network for which the Network has no adequate remedy at law.

116.    The Network is therefore entitled to injunctive relief and to recover Defendants' profits, statutory damages, monetary damages, enhanced profits and damages, costs, and reasonable attorneys' fees under 15 U.S.C. § 1117(a).

**FIFTH CLAIM FOR RELIEF**
**Injury to Business Reputation and Dilution**
**(N.Y. Gen. Bus. L. § 360-1)**

117.    The Network repeats and incorporates by reference the allegations in the preceding paragraphs.

118.    The Network has extensively and exclusively used the Yellowstone Marks in interstate commerce in New York and the greater United States since at least as early as 2018.

119.    The Yellowstone Marks became distinctive and widely-known to the general public in New York and the United States before Defendants began their infringing conduct.

120.    The Network owns common law trademark rights in the Yellowstone Marks.

121.    Defendants' unauthorized use of confusingly similar imitations of the Yellowstone Marks is likely to cause confusion, deception, and mistake by creating the false and misleading impression that the Infringing Products are manufactured or distributed by the

Network, or are associated or connected with the Network, or have the sponsorship, endorsement, or approval of the Network.

122.    Defendants' conduct is diluting or is likely to dilute—and unless enjoined by the Court, will continue to dilute—the distinctive qualities of the Yellowstone Marks by eroding the public's exclusive identification of these marks with the Network and otherwise lessening the capacity of the Yellowstone Marks to identify and distinguish the Network's goods and services.

123.    Defendants' conduct is causing injury to the Network's business reputation and the goodwill and reputation symbolized by the Yellowstone Marks, for which the Network has no adequate remedy at law.

124.    Defendants' conduct demonstrates a willful, wanton, and malicious intent to cause business injury to the Network and to dilute and trade on the goodwill associated with the Yellowstone Marks to the Network's great and irreparable harm.

125.    The Network, therefore, is entitled to injunctive relief, damages, and costs, as well as, if appropriate, enhanced damages, punitive damages, and reasonable attorneys' fees.

## SIXTH CLAIM FOR RELIEF
**Common Law Trademark Infringement and Unfair Competition**

126.    The Network repeats and incorporates by reference the allegations in the preceding paragraphs.

127.    The Network has extensively and exclusively used the Yellowstone Marks in interstate commerce in New York and the greater United States since at least as early as 2018.

128.    The Yellowstone Marks became widely-known by the general public in New York and throughout the United States and attained secondary meaning before Defendants began their infringing conduct.

129.    The Network owns common law trademark rights in the Yellowstone Marks.

130.    Defendants' unauthorized use of confusingly similar imitations of the Yellowstone Marks is likely to cause confusion, deception, and mistake by creating the false and misleading impression that the Infringing Products are manufactured or distributed by the Network, or are associated or connected with the Network, or have the sponsorship, endorsement, or approval of the Network.

131.    Defendants have made false representations, false descriptions, and false designations of the Infringing Products.

132.    Defendants' conduct has caused—and unless enjoined by the Court, will continue to cause—a likelihood of confusion and deception of members of the trade and public, and, additionally, injury to the Network's goodwill and reputation as symbolized by the Yellowstone Marks, for which the Network has no adequate remedy at law.

133.    Defendants' conduct demonstrates a willful, wanton, and malicious intent to trade on the goodwill associated with the Yellowstone Marks to the Network's great and irreparable harm.

134.    The Network, therefore, is entitled to injunctive relief and to recover Defendants' profits, damages, and costs. Further, in light of Defendants' deliberate and malicious use of confusingly similar imitations of the Yellowstone Marks, and the need to deter Defendants and others from engaging in similar conduct in the future, punitive damages are also appropriate.

## PRAYER FOR RELIEF

WHEREFORE, the Network prays that:

1.    Defendants and all of their agents, officers, employees, representatives, successors, assigns, attorneys, and all other persons acting for, with, by through or under authority from Defendants, or in concert or participation with Defendants, and each of them, be immediately and permanently enjoined from:

a.  using the Yellowstone Marks or any other copy, reproduction, colorable imitation, or simulation of the Yellowstone Marks in any domain name, on any website, or on or in connection with the marketing, promotion, advertising, sale, or offering for sale of clothing, footwear, or accessories;

b.  passing off, palming off, or assisting in the passing off or palming off the Infringing Products as that of the Network, or otherwise continuing any and all acts of trademark infringement and unfair competition as alleged in this Complaint; and

c.  advertising, promoting, offering for sale, or selling the Infringing Products or other goods bearing confusingly similar imitations of the Yellowstone Marks;

d.  registering or using any domain name containing confusingly similar imitations of the Yellowstone Marks;

e.  using, reproducing, or displaying the Works or any copyrightable material related thereto in any manner or in any medium, including on any website, social media page, or advertisement; and

f.  aiding, assisting, or abetting any other person or entity in doing any act prohibited by the foregoing subparagraphs, including, but not limited to, selling, assigning, or transferring the Infringing Domains other than as requested in Paragraph 4 below;

2.  Defendants be ordered to immediately cease offering for sale, marketing, promoting, and selling, and to recall all products sold under or bearing any confusingly similar

imitations of the Yellowstone Marks that are in Defendants' possession, custody, or control, or have been shipped by Defendants or under their authority, to any customer, including but not limited to, any wholesaler, distributor, retailer, consignor, or marketer, and also to deliver to each such store or customer a copy of this Court's order as it relates to said injunctive relief against Defendants;

3.      Defendants be ordered to deliver up for impoundment and for destruction, all clothing, footwear, accessories, signs, advertising, sample books, promotional materials, or other materials in the possession, custody, or control of Defendants that bear confusingly similar imitations of the YELLOWSTONE Marks within ten days of entry of judgment;

4.      Defendants be ordered to take all reasonable steps to effectuate the transfer of the Infringing Domains, and any other domain names owned or controlled by Defendants or those acting in concert with them containing confusingly similar imitations of the Yellowstone Marks, to the Network within ten days of entry of judgment.

5.      Defendants be compelled to provide a full accounting to the Network for its purchase, sale, and distribution of the Infringing Products—including full identification of any and all suppliers or wholesalers of the Infringing Products and any and all profits derived by Defendants from the sale or distribution of the Infringing Products—and profits derived from the registration or use of the Infringing Domains, and remit to the Network all such profits;

6.      The Network be awarded all damages caused by the acts forming the basis of this Complaint, including a reasonable royalty of no less than 10% of sales of the Infringing Products;

7.      The Court treble the above profits and damages awards;

8.      The Network be awarded statutory damages based on Defendants' willful

copyright infringement in the amount of $150,000 per Work infringed;

9.     The Network be awarded statutory damages based on Defendants' willful, bad faith domain name registration and cybersquatting, in the amount of $100,000 per infringing domain name, i.e., $200,000.

10.     Defendants be ordered to pay the Network the costs of this action and the Network's reasonable attorneys' fees;

11.     Defendants be ordered to pay the Network, for purposes of deterrence, punitive damages in the amount of at least $50,000;

12.     The Network be awarded prejudgment and post-judgment interest on all monetary awards in the amount of not less than 9%;

13.     Defendants be held jointly and severally liable for all of the foregoing; and

14.     The Court order any other and further relief as it may deem just.

DATED:  July 29, 2021

Respectfully submitted,

KILPATRICK TOWNSEND & STOCKTON LLP

By: */s/ H. Forrest Flemming, III*
H. Forrest Flemming, III
1114 Avenue of the Americas
New York, NY 10036-7703
Telephone:  (212) 775-8845
fflemming@kilpatricktownsend.com

*Attorneys for Plaintiff*