ORIGINAL

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 11/2/21

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

SPIKE CABLE NETWORKS INC.,

Plaintiff,

v.

YELLOWSTONE MERCH and SAMSON
CHRISTOPHER,

Defendants.

21 Civ. 6468 (LLS)

**DEFAULT JUDGMENT AND**
**PERMANENT INJUNCTION**

Before the Court is the Motion for Default Judgment filed by Plaintiff Spike Cable

Networks Inc. on October 12, 2021 (the "Motion"). Because the Motion seeks only statutory

damages and equitable relief, a hearing is not required. Upon consideration of all filings in

connection with the Motion, as well as all pleadings, the Court rules as follows:

## I.    FINDINGS OF FACT

### A.    Plaintiff and its "Yellowstone" Television Series

1.    Plaintiff Spike Cable Networks Inc., known to consumers as "Paramount

Network," is a well-known cable TV network home to famous series like LIP SYNC BATTLE,

INK MASTER, and BAR RESCUE. Compl. ¶¶ 1-2.

2.    One of Plaintiff's most popular series is the critically acclaimed drama

YELLOWSTONE, starring Kevin Costner, Kelly Reilly, Cole Hauser, Luke Grimes, and Wes

Bentley (the "Series"). *Id.* ¶ 3.

1







3. The Series has been a tremendous success for Plaintiff, with its Season 1 premiere on June 20, 2018, drawing more than 4.8 million viewers—at the time, the largest ever for Plaintiff—and its Season 3 premiere on June 21, 2020, drawing more than 7 million viewers. *Id.* ¶ 4.

4. The Series is available to stream on the Paramount Network website and is available to purchase and download on various digital platforms, including Amazon Prime and Peacock. *Id.* ¶ 24.

5. The Series is a modern-day Western that follows the Dutton family, led by patriarch John Dutton (played by Kevin Costner). *Id.* ¶ 25.

6. The Duttons control the largest contiguous ranch in the United States and must contend with constant attacks by land developers and others. *Id.*

7. Kelly Reilly portrays John's daughter Beth Dutton, a highly educated and intelligent financier, and Cole Hauser plays Rip Wheeler, Beth's love interest and John's right-hand man. *Id.* ¶ 26.

8. Luke Grimes portrays John's once-estranged son Kayce Dutton, a former US Navy SEAL. Wes Bentley plays John's other surviving son Jamie Dutton, a Harvard-educated attorney who helps the family on legal issues. *Id.* ¶27.

9. The original airings of every episode in Seasons 1 and 2 of the Series ranked in at least the top 10 entertainment telecasts on ad-supported cable for that day, with many episodes earning the number one ranking. Compl. ¶ 29.

10. The June 21, 2020, premiere of Season 3 attracted an amazing 7 million viewers, and with at least 6 million viewers of each subsequent episode, "Yellowstone" was 2020's most watched cable series. *Id.* ¶ 30.

3

**B.    Plaintiff's Trademark Rights**

11.    In connection with the Series, related marketing and promotional materials, and sales of various merchandise, Plaintiff uses the word mark YELLOWSTONE, both standing alone and with a Y design (the "Y Logo"), as shown in the example below:



Compl. ¶ 31. The above mark, along with the Y Logo and YELLOWSTONE word mark, are collectively referred to as the "Yellowstone Marks."

12.    On November 18, 2019, Plaintiff applied to register the mark

**Y
YELLOWSTONE** with the United States Patent & Trademark Office (the "USPTO") in International Class 41.

13.    On April 28, 2020, the USPTO issued Reg. No. 6,042,705 to Plaintiff, which is valid and subsisting. Compl. ¶ 32, Ex. 1.

14.    On October 17, 2019, Plaintiff applied to register the mark **Y** with the USPTO in International Class 25 for "footwear." On May 12, 2020, the USPTO issued Reg. No. 6,053,377 to Plaintiff, which is valid and subsisting. Compl. ¶ 33, Ex. 2.

15.    On October 17, 2019, Plaintiff applied to register the mark **Y** with the USPTO in International Class 25, for clothing goods, such as t-shirts, vests, jackets, and the like.

4

The application for the foregoing mark, bearing App. No. 88658527 (the "Application"), was published by the USPTO on February 25, 2020, and was not opposed. *Id.* ¶ 34, Ex. 3.

16. Plaintiff has spent millions of dollars advertising, promoting, and marketing the Yellowstone Marks and the Series in the United States. As a result of Plaintiff's efforts, consumers have come to associate the Yellowstone Marks exclusively with Plaintiff and the Series. Compl. ¶¶ 35-37.

17. In 2020, Plaintiff capitalized on the success of the Series and its goodwill in the Yellowstone Marks by offering, and licensing others to offer, merchandise branded with the Yellowstone Marks, such as T-shirts, vests, and other apparel and accessories. Compl. ¶ 38.

18. Official YELLOWSTONE-branded merchandise is currently available at Plaintiff's <YellowstoneTVShop.com> website, as well as other locations. *Id.* ¶ 39.

19. Sales of YELLOWSTONE-branded merchandise, and associated licensing fees and royalties, have proven lucrative for Plaintiff, such that the company's exclusive rights to use or license the Yellowstone Marks are extremely valuable. *Id.* ¶ 40.

20. The Yellowstone Marks and the Series have also attracted significant unsolicited media attention from national and local outlets. Yellowstone has been covered in numerous articles published by *The New York Times*, *The New Yorker*, *New York Magazine*, *The Washington Post*, *Entertainment Weekly*, *CNN*, and *NPR*, to name a few. Compl. ¶ 41, Ex. 4.

21. In addition to being a clear commercial success, the Series has also been a critical success. For example, Season 3 of the Series earned a 100% critic score on review site Rotten Tomatoes—a season which also earned the Series an Emmy nomination. *Id.* ¶ 42.

22. Even prior to 2021, due to Plaintiff's significant advertising, marketing, and promotion of the Yellowstone Marks and the Series, as well as extensive unsolicited attention

5

from both consumers and the press, the Yellowstone Marks became well-known and distinctive in New York and throughout the United States, with consumers viewing the marks as indicators of origin and associating them exclusively with Plaintiff and the Series. *Id.* ¶ 43.

23.     Accordingly, the Yellowstone Marks have considerable conceptual and commercial strength, and Plaintiff has built up and now owns extremely valuable goodwill that is symbolized by them. *Id.* ¶ 44.

**C.     Plaintiff's Copyrights**

24.     Subject to certain preexisting material—namely, preexisting music—each episode of the Series (collectively, the "Works") is a motion picture and an original work of authorship, embodying copyrightable subject matter and subject to the full protection of the copyright laws of the United States. Compl. ¶ 45.

25.     To the extent necessary, all contractors who contributed to the Works have expressly agreed via signed written instruments that all their contributions to the Works are deemed works made for hire by Plaintiff. *Id.* ¶ 46.

26.     All employees and agents of Plaintiff who contributed to the Works were operating fully within the scope of their employment with Plaintiff. *Id.* ¶ 47.

27.     Thus, through operation of law and/or written instrument, Plaintiff is the author and sole and exclusive owner of all right, title, and interest in and to the copyrights in the Works. *Id.* ¶ 48.

28.     Plaintiff has complied with all requirements and formalities of the Copyright Act with respect to the Works and obtained copyright registrations for each of them. *Id.* ¶¶ 49-50, Ex. 5.

**D.     Defendants' Bad-Faith Infringement of Plaintiff's Intellectual Property**

29.     Defendants registered the domain name <YellowstoneMerch.com> (the "Yellowstone Merch Domain") on January 7, 2021, and used a privacy service to conceal their identities. Compl. ¶ 51, Ex. 6.

30.     At the time Defendants registered the Yellowstone Merch Domain, the "Yellowstone" Series and Marks were distinctive and already widely known among the general public in the United States and associated exclusively with Plaintiff—a fact of which Defendants were well aware. *Id.* ¶ 53.

31.     Defendants registered and are using the Yellowstone Merch Domain in a bad faith attempt to exploit Plaintiff, the Series, and its Yellowstone Marks, and to profit from the value of the Yellowstone Marks. Compl. ¶ 54.

32.     Barely a month after registration of the domain, the website (the "Yellowstone Merch Website") displayed numerous copyrighted images and other materials from the Series— like character names John Dutton, Beth Dutton, and Rip Wheeler—and offered for sale products bearing the Yellowstone Marks. *Id*, Ex. 7.

7





33.     By April 2021, Defendants' misuse of Plaintiff's intellectual property was even

more egregious (Compl. ¶ 55):

8





34.     Defendants openly admit on the Yellowstone Merch Website that they are intentionally capitalizing on the popularity of the Series and Plaintiff's goodwill in the Yellowstone Marks, stating: "Yellowstone Fans are going crazy for Yellowstone merchandise . . . after seeing the incredible series," and "Yellowstone merchandise has been popular and in-demand among their fans. Compl. ¶ 56.

35.     And they are constantly seeking out Yellowstone Merchandise." *Id.*

36.     Defendants also admit to selling exact "replicas" of YELLOWSTONE-branded merchandise on their website, which Plaintiff never authorized Defendants to do. *Id.* ¶ 57.

## About **Yellowstone Merchandise**

Yellowstone Fans are going crazy for Yellowstone merchandise due to an amazing outfit worn by their favorite celebrities like John Dutton, Rip Wheeler, and Beth Dutton after seeing the incredible series.
Besides in the Yellowstone TV series characters wore extraordinary outfits specially Jackets. Those outfits which incorporate  Jackets, coats and vests are available at Yellowstone merch.com. We provide an amazing collection, when it comes to Yellowstone leather jackets. Cotton, silk, and denim materials are utilized in the manufacturing of these outclass merchandise.

Yellowstonemerch.com likewise has numerous other merchandise persuasive outfits. Other outfits are unique in relation to these due to various styles and colors. Each outfit is stunning. Yellowstone merchandise has been popular and in-demand among their fans. And they are constantly seeking out for Yellowstone Merchandise. We offers a replica of Yellowstone Jackets in premium quality and an outstanding style with color same as the original. We promise to provide quality and with every minimal detailing as you have seen in the original. Moreover, the Yellowstone Rip Wheeler Jacket and t-shirt are also available here. As the amazing collection doesn't end here, We also offers a huge quantity of classic vests that are designed especially for providing comfort. You are at the perfect place if you are also a fan of classic vest coats.

37.     Defendants further claim to have seven "Best Sellers," each of which is offered under the Yellowstone Marks and displays copyrighted materials, including images from the Series and character names, as shown below. Compl. ¶ 58.



38.     The Yellowstone Merch Website homepage, "Terms & Conditions," and "Contact Us" pages each state that the company is located at 47 W. 13th Street, New York, New York 10011. Compl. ¶ 59, Ex. 8.

*39.*     The Terms & Conditions further state that "The laws of [New York, United States] . . . shall govern this Terms and Your use of the Service." *Id.*

40.     On April 28, 2021, Plaintiff contacted Yellowstone Merch to demand that the company cease all of its infringing activities, including by removing all copyrighted materials from the Yellowstone Merch Website, ceasing all use of the YELLOWSTONE Marks, and transferring the Yellowstone Merch Domain to Plaintiff. Compl. ¶ 60.

41.     On May 12, 2021, Plaintiff received a response from "Shawn," who identified themselves as "Manager at Yellowstone Merch." *Id.* ¶ 61.

*42.*     Shawn stated that they would send Plaintiff's demand letter "to upper-level management including Yellowstone Merch Founder, CEO, and Directors." *Id.*

43.     The signature block for Shawn's email stated that Yellowstone Merch was located at "47 West 13th Street, New York, NY 10011." *Id.*, Ex. 9.

44.     Plaintiff followed up with Shawn several times, and on June 12, 2021, Defendant Samson Christopher emailed back, identifying himself as the CEO of Yellowstone Merch. Compl. ¶ 62.

*45.*     Mr. Christopher agreed to "remove all the TV Series 'Yellowstone' copyright reserved photos from our website including site banners, product images by this Monday [June 14, 2021]." *Id.*

46.     On June 14, Mr. Christopher stated: "I alerted our team to remove all the images related to your TV series IP and other removal" but would "need 3-4 days to complete." *Id.*, Ex. 10.

47.     Defendants then removed some, but not all, copyrighted images from the Yellowstone Merch Website. *Id.* ¶ 63.

*48.* Defendants also changed their logo from an exact copy of Plaintiff's Y Logo (as seen first immediately below with the stylized Y Logo) to a confusingly similar imitation (as seen next immediately below with a yellow Y). *Id.*



49. Despite numerous follow-ups, Defendants never again responded to Plaintiff. Instead, Defendants re-posted on their website many of the unauthorized copyrighted images they had previously removed. Compl. ¶ 64, Ex. 11.

50. Defendants registered the domain name <YellowstoneOutfits.com> (the "Yellowstone Outfits Domain" and, together with the Yellowstone Merch Domain, the "Infringing Domains") on March 2, 2021, and used the same privacy service to conceal their identities. Compl. ¶ 65, Ex. 12.

51. At the time Defendants registered the Yellowstone Outfits Domain, the Series and Yellowstone Marks were distinctive and already widely known among the general public in the United States and associated exclusively with Plaintiff—a fact of which Defendants were well aware. *Id.* ¶ 66-67.

52. The timing of the launch of the domain's website (the "Yellowstone Outfits Website" and, together with the Yellowstone Merch Website, the "Infringing Websites"), as well

as the website itself, demonstrates that Defendants registered and are using the Infringing

Domains and Websites in a bad faith attempt to target Plaintiff and its Yellowstone Marks, and

to profit from the value of the Yellowstone Marks. *Id.* ¶ 68.

53. On approximately June 28, 2021—just two weeks after Defendants agreed to

comply with many of Plaintiff's demands—Defendants launched the Yellowstone Outfits

Website, which uses an exact copy of the stylized Y Logo and contains the same infringing

material originally displayed on the Yellowstone Merch Website. Compl. ¶ 69, Ex. 13.





**SHOP BY CHARACTER**






JOHN DUTTON          RIP WHEELER          KAYCE DUTTON          BETH DUTTON



## Kevin Costner Yellowstone John Dutton Black Cotton Vest

~~$219.00~~ **$149.00**

Size

3XL   L   M   S   XL   XS   XXL
XXS

−  1  +    **ADD TO CART**

SKU: YSM-002

Categories: Men, Yellowstone Vests

54.     Defendants launched the Yellowstone Outfits Website in a bad faith attempt to continue their infringing activities while escaping detection from Plaintiff. Compl. ¶ 74.

55. Defendants have even stamped the phrase "©YELLOWSTONEOUTFITS" across copyrighted images from the Series that Defendants are using to sell Infringing Products on the Yellowstone Outfits Website. *Id.* ¶ 70.



**Luke Grimes Yellowstone Kayce Dutton Denim Jacket**

**$129.00**

Size

| 3XL | L | M | S | XL | XS | XXL |

| XXS |

- 1 + **ADD TO CART**

SKU: YSM-039

Categories: **Kayce Dutton Yellowstone Merchandise, Men, Yellowstone Jackets**

(f)(y)(✉)(℗)(in)

56. The homepage of the Yellowstone Outfits Website lists an address of 47 W. 13th Street, New York, New York 10011. Compl. ¶ 71, Ex. 14.

57. On June 28, 2021, Defendants created an account on Reddit.com to advertise "Yellowstone Outfits & Merchandise" using a copyrighted image from the Series, stating in one post: "We launch a best leather jackets in USA a very reasonable price and best quality of design. There is a lot of unique design and your favorite actress jackets are also available let's checkout Yellowstone Outfits." Compl. ¶ 72, Ex. 15.

16

58. All of Defendant Yellowstone Merch's unlawful conduct has been personally directed and overseen by Defendant Samson Christopher, who at all times relevant has been the sole moving force behind Yellowstone Merch's infringing activities. *Id.* ¶ 85.

**E.  Defendants' Willful Post-Complaint Infringement**

59. After Plaintiff filed this lawsuit on August 25, 2021 (Dkt. 1), Defendants, in a display of further bad faith and willfulness, took steps to (a) increase the scope of their trademark and copyright infringement and (b) avoid Plaintiff's enforcement of its rights.

60. First, Defendants added new copyrighted images from the Series to the Yellowstone Merch Website, including the following (Declaration of H. Forrest Flemming, III ("Flemming Decl.") ¶ 2, Ex. 1):



Kelly Reilly Yellowstone Beth Dutton
Cheetah Print Coat

$210.00



John Dutton Faux Fur Lining Suede
Leather Jacket
~~$220.00~~ $180.00

61. Second, Defendants added back several copyrighted images to the Yellowstone Merch Website that they had previously removed at Plaintiff's request. *Id.* ¶ 3.

17

62.     Third, after Plaintiff submitted takedown notices to the internet hosting providers

of the Infringing Websites on grounds of copyright infringement, Defendants switched hosting

providers—thus evading Plaintiff's lawful enforcement efforts. *Id.* ¶ 4.

## III.     CONCLUSIONS OF LAW

**A.     The Court Has Jurisdiction**

### 1.     The Court Has Subject Matter Jurisdiction Over Plaintiff's Claims

63.     The Court has original jurisdiction over Plaintiff's claims arising under the

Lanham Act, 15 U.S.C. §§ 1051 *et seq.*, the Copyright Act of 1976, 17 U.S.C. §§ 101 *et seq.*, and

the Anticybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125(d), pursuant to 15

U.S.C § 1121, as well as 28 U.S.C. §§ 1331, 1338.

64.     The Court has supplemental jurisdiction over Plaintiff's state law claims because

those claims arise out of the same common nucleus of operative fact as Plaintiff's Lanham Act

and Copyright Act claims—i.e., Defendants' unauthorized use of Plaintiff's intellectual

property—and therefore constitute one claim or controversy. 28 U.S.C. § 1367; Compl. ¶¶ 117-

134.

### 2.     The Court Has Personal Jurisdiction Over Defendants

65.     The Court has general personal jurisdiction over Defendant Yellowstone Merch

because Yellowstone Merch has its principal place of business in New York. Compl. ¶¶ 14, 59,

61-62, 71; *id.* Exs. 8-10, 14. *See Ford Motor Co. v. Montana Eighth Judicial Dist. Ct.*, 141 S. Ct.

1017, 1024 (2021) (holding that a corporation is subject to general jurisdiction in the forum of its

"principal place of business").

66. The Court has general personal jurisdiction over Defendant Samson Christopher because Mr. Christopher is domiciled in New York. Compl. ¶ 15. *See Ford Motor Co.*, 141 S. Ct. at 1024 ("[A]n individual is subject to general jurisdiction in her place of domicile.").

67. The Court also has specific personal jurisdiction over both Defendants because they have both taken acts by which they "purposefully avail" themselves of "the privilege of conducting activities within" New York. *Ford Motor Co.*, 141 S. Ct. at 1024-25.

68. In particular, Defendants have operated at least one business out of a New York address—a business that is engaging in the unlawful conduct underlying all of Plaintiff's claims. *See* Compl. ¶¶ 14, 59, 61-62, 71; *id.* Exs. 8-10, 14.

69. As the Supreme Court has often held, when a person "'exercises the privilege of conducting activities within a state'—thus 'enjoying the benefits and protection of its laws'—the State may hold the [person] to account for related misconduct." *Ford Motor Co.*, 141 S. Ct. at 1025 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985)). That is exactly what Defendants have done here by operating their "Yellowstone Merch" and "Yellowstone Outfits" businesses out of New York. *See Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 170-71 (2d Cir. 2010) (holding that personal jurisdiction was proper under New York's long-arm statute and the Due Process Clause because defendant "operated a highly interactive website offering [infringing products] for sale to New York consumers").

**3. Service of Process on Defendants Was Proper**

70. On August 18, 2021, Plaintiff moved, pursuant to Federal Rules of Civil Procedure 4(e)(1) and 4(h)(1)(A), for leave to serve Defendants with process via email to the following email addresses: <contact@yellowstonemerch.com>;

19

<samson@yellowstonemerch.com>; <contact@yellowstoneoutfits.com>; and

<sales@yellowstoneoutfits.com>. Dkt. No. 13.

71.     Plaintiff established that such service was proper under the Federal Rules, New

York law, and due process principles. *Id.* at 9-11.

72.     On August 31, the Court granted Plaintiff's motion. Dkt. No. 18.

73.     On August 31, 2021, Plaintiff completed service of the summons and Complaint

by the means permitted by the Court, and Plaintiff filed a Certificate of Service showing the

same on September 1. Dkt. No. 19.

74.     Thus, service of process was proper.

**B.      All Three Default Factors Weigh in Plaintiff's Favor**

75.     "When determining whether to grant a motion for default judgment, courts in this

district consider three factors: (1) whether the defendant's default was willful; (2) whether

defendant has a meritorious defense to plaintiff's claims; and (3) the level of prejudice the non-

defaulting party would suffer as a result of the denial of the motion for default judgment."

*Santana*, 198 F. Supp. 3d at 291. Here, all three factors weigh heavily in Plaintiff's favor.

76.     First, Defendants' default was willful because they were "properly served yet

failed to appear, answer, or otherwise respond to the complaint." *New York by James v. Debt

Resolve, Inc.*, No. 18-CV-09812 (AJN) (SN), 2021 WL 1200217, at *2 (S.D.N.Y. Feb. 4, 2021).

Further, Defendants were served with the Clerk's entry of default over two weeks ago yet still

have not appeared or moved to set it aside. Dkt. No. 24; Flemming Decl. ¶ 3.

77.     Second, Defendants have not asserted any "meritorious defense," as they failed to

"answer or otherwise respond to the complaint, weighing in favor of default judgment." *Debt

Resolve*, 2021 WL 1200217, at *2.

78.     Third, Plaintiff would be severely prejudiced by the denial of this motion because it will have "no additional steps available to secure relief" from Defendants' ongoing infringement of Plaintiff's valuable intellectual property. *Id.* at *3.

79.     Indeed, Defendants' unlawful conduct is causing Plaintiff severe—and irreparable—harm that warrants immediate and permanent injunctive relief. *Triangl Grp. Ltd. v. Jiangmen City Xinhui Dist. Lingzhi Garment Co.*, No. 16 CIV. 1498 PGG, 2017 WL 2829752, at *5 (S.D.N.Y. June 22, 2017) ("[T]he ongoing infringement that defaulting defendants are engaged in is causing irreparable harm to plaintiffs' reputation and business. Under these circumstances, denying plaintiffs a default judgment would effectively leave them without a remedy.").

## C.     Defendants Are Liable for Copyright Infringement

80.     Plaintiff pled ownership of valid copyrights in the Works by attaching documents from the Copyright Office's registry showing the owner and registration number of each of the Works. Compl. ¶¶ 45-50, 102-03; *id.* Ex. 5. *See Bass v. Diversity Inc. Media*, No. 19-CV-2261 (AJN), 2020 WL 2765093, at *2 (S.D.N.Y. May 28, 2020) (granting default judgment where "Plaintiff's Complaint alleges that she owns a valid copyright in the photograph under Copyright Registration Number VA 2-120-590."); *Papazian v. Sony Music Ent.*, No. 16-CV-07911 (RJS), 2017 WL 4339662, at *6 n.6 (S.D.N.Y. Sept. 28, 2017) ("The Court is entitled to take judicial notice of copyright registrations as published in the Copyright Office's registry.").

81.     Plaintiff pled that Defendants actually copied and displayed Plaintiff's copyrighted materials, "including images from the Series and character names." Compl. ¶¶ 54-55, 58, 64, 69, 72, 83, 104-05; *id.* Exs. 7-8, 13, 15. And the Complaint and its exhibits demonstrate that there are more than just "substantial similarities" between the Infringing

Websites and the protectable elements of the Works, as the copying was exact. *Boisson v. Banian, Ltd.*, 273 F.3d 262, 268 (2d Cir. 2001) (holding that "substantial similarities" between infringement and protectable elements of a work constitutes improper copying).

82.     At least seventeen of the Works were infringed, as Defendants copied character names and still images from them, and also created "derivative works" from each of them. *See Twin Peaks Prods., Inc. v. Publcn's Int'l, Ltd.*, 996 F.2d 1366, 1327-73 (2d Cir. 1993) (all eight episodes of television series infringed by book that included, among other things, descriptions of "the characters and the actors who play them"); Declaration of Laurie Dillon ¶ 2.

83.     Thus, Defendants are liable for copyright infringement.

84.     Defendant Christopher is also personally liable for Defendant Yellowstone Merch's copyright infringement.

85.     "It is well established that all persons and corporations who participate in, exercise control over or benefit from an infringement are jointly and severally liable as copyright infringers and that an individual, including a corporate officer, who has the ability to supervise infringing activity and has a financial interest in that activity, or who personally participates in that activity is personally liable for infringement." *ABKCO Music, Inc. v. Sagan*, No. 15 CIV. 4025 (ER), 2018 WL 1746564, at \*22 (S.D.N.Y. Apr. 9, 2018) (citation omitted).

86.     Here, Plaintiff pled that Mr. Christopher is "the CEO of Yellowstone Merch," claimed in correspondence with Plaintiff that he had control and decision-making authority over what was displayed on the Infringing Websites, "personally directed and over[saw]" Yellowstone Merch's "unlawful conduct," and "at all times relevant has been the sole moving force behind Yellowstone Merch's infringing activities." Compl. ¶¶ 62, 85; *id.* Ex. 10.

22

**D.     Defendants Are Liable for Trademark Infringement**

87.     To succeed on a trademark infringement or unfair competition claim under the Lanham Act, the plaintiff "must show that it has a valid mark that is entitled to protection under the Lanham Act and that [the Defendants'] actions are likely to cause confusion with [Plaintiff's] mark." *Gucci Am., Inc. v. Tyrell-Miller*, 678 F. Supp. 2d 117, 119 (S.D.N.Y. 2008). Both elements are satisfied here.

88.     First, Plaintiff pled that it "owns federal trademark registrations" for two of the Yellowstone Marks and "common law rights" in all three. Compl. ¶¶ 5, 31-34, 95; *id.* Exs. 1-3; *see Gucci Am, Inc.*, 678 F. Supp. 2d at 119 ("Plaintiff asserts that it is the owner of fifteen (15) federally registered and common law trademarks ........ This satisfies the first prong of the test.").

89.     Second, according to the factors articulated in *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961),[1] Defendants' conduct is likely to cause confusion. *See Int'l Council of Shopping Ctrs., Inc. v. Global Infotech LLC*, 18-CV-8856 (AJN), 2019 WL 2004096, at *3 (S.D.N.Y. May 7, 2019) (assessing *Polaroid* factors in default judgment context).

90.     The allegations in the Complaint establish that: (1) the Yellowstone Marks are strong (Compl. ¶¶ 40-44); (2) Defendants are using "substantially identical, or confusingly similar" marks (*id.* ¶¶ 54-55, 69-70, 74, 88); (3) the parties use their marks on the same types of products that "directly compete" with each other (*id.* ¶¶ 38, 54, 57, 74); (4) Defendants' conduct is causing confusion (*id.* ¶ 82); (5) and Defendants' conduct was "willful" and in "bad faith" (*id.* ¶¶ 51-85).

---

[1] Those factors are: (1) the strength of the plaintiff's marks; (2) the similarity of the parties' marks; (3) the proximity of the products; (4) actual confusion; (5) the likelihood the plaintiff will bridge the gap between the parties' markets; (6) defendants' intent; (7) the quality of defendants' products; and (8) the sophistication of consumers. *See Polaroid*, 287 F.2d at 495.

91. Thus, Plaintiff has shown a likelihood of confusion, and Defendants are liable for trademark infringement.

92. And as in the copyright context, Defendant Christopher is personally liable for trademark infringement because he was a "moving, active, conscious force" behind "the trademark infringement" of Yellowstone Merch. *Flat Rate Movers, Ltd. v. FlatRate Moving & Storage, Inc.*, 104 F. Supp. 3d 371, 383 (S.D.N.Y. 2015); Compl. ¶¶ 62, 85.

## E.  Defendants Are Liable Under the ACPA

93. An ACPA claim requires a showing that: (1) the plaintiff's marks "were distinctive at the time the [infringing] domain name was registered; (2) the infringing domain name is "identical to or confusingly similar to plaintiff's mark"; and (3) "the infringer has a bad faith intent to profit from that mark." *Elastic Wonder, Inc. v. Posey*, No. 13 CV 5603 (JGK), 2015 WL 273691, at *5 (S.D.N.Y. Jan. 22, 2015). The Complaint and undisputed evidence establish all three elements.

94. First, the "Yellowstone Marks became distinctive and widely-known to the general public in . . . the United States before Defendants began their infringing conduct." Compl. ¶¶ 35, 53, 67, 119.

95. Second, both Infringing Domains incorporate the YELLOWSTONE word mark in its entirety, only adding generic terms like "merch" and "outfits," which consumers do not view as separate indicators of source. Compl. ¶¶ 52, 66. The domains are therefore "confusingly similar" to the YELLOWSTONE word mark. *See Spear, Leeds, & Kellogg v. Rosado*, 122 F. Supp. 2d 403, 406 (S.D.N.Y.) ("[D]omain names that combine SLK's distinctive mark REDI with generic or descriptive financial industry terms, such as redi-ecn.com and redixt.com, [are] confusingly similar to SLK's mark REDI."), *aff'd*, 242 F.3d 368 (2d Cir. 2000).

24

96. Third, Defendants have a "bad faith intent to profit" from the YELLOWSTONE word mark, as evidenced by, among many other facts: Defendants' lack of "intellectual property rights" in the mark and their "commercial use" of the Infringing Domains, *see id.*; their use of Plaintiff's "Y Logo"; their registration of not one, but two YELLOWSTONE-formative domains; their launching of the Yellowstone Outfits Website after agreeing to cease their infringement; their references on the Infringing Websites to how "Yellowstone Fans are going crazy for Yellowstone merchandise," *see id.* ¶¶ 51-72, 113; and Defendants' addition of new infringing images, and reinstatement of previously removed ones, to the Websites after the Complaint was filed. Flemming Decl. ¶ 4.

97. Both Defendants are liable for this conduct. *See* 15 U.S.C. 1125(d)(1)(D); *Hamptons Locations, Inc. v. Rubens*, 640 F. Supp. 2d 208, 214-15 (E.D.N.Y. 2009); Compl. ¶¶ 62, 79.

## *F.* **Defendants are Liable Under N.Y. Gen. Bus. Law § 360-*l***

98. To prevail on a claim under Section 360-*l*, a plaintiff must prove that: "(1) its mark possesses a 'distinctive quality capable of dilution,' and (2) there is a likelihood of such dilution." *CommScope, Inc. v. Commscope (U.S.A.) Int'l Grp. Co., Ltd.*, 809 F. Supp. 2d 33, 39 (N.D.N.Y. 2011) (citation omitted). The Complaint establishes both elements.

99. First, Plaintiff has alleged ownership of the Yellowstone Marks, and that they were distinctive in New York before Defendants began their infringing conduct. Compl. ¶¶ 118-120.

100. Second, Plaintiff has alleged that "Defendants' conduct is diluting or is likely to dilute . . . the distinctive qualities of the Yellowstone Marks....... " Compl. ¶ 122.

25

101.    These allegations are sufficient to establish liability. *See CommScope, Inc.*, 809 F.

Supp. 2d at 39 (allegation that defendant's conduct was "likely to injure the business reputation

and/or dilute the distinctive quality of Plaintiff's marks and trade name" was sufficient).

## G.    Defendants are Liable for Common Law Trademark Infringement and Unfair Competition

102.    "Having established Defendant[s'] liability for trademark infringement under the

Lanham Act, Plaintiff has also established liability under New York State common law," and

"can also establish liability on its unfair competition claims under New York State common law

by showing that Defendant[s'] infringement was in bad faith." *CommScope, Inc.*, 809 F. Supp.

2d at 38; *see also* Compl. ¶¶ 126-34.

103.    The evidence of Defendants' bad faith is alleged at length in the Complaint. *See,

e.g.*, Compl. ¶¶ 51-85.

104.    In addition, Defendants have demonstrated bad faith since the filing of the

Complaint by evading Plaintiff's enforcement efforts, by reinstating previously-removed

infringements, and even adding new ones to the Infringing Websites. Flemming Decl. ¶ 4, Ex. 1.

## H.    Plaintiff is Entitled to Injunctive Relief, Transfer of the Infringing Domain Names, Statutory Damages, Attorney's Fees, and Post-Judgment Interest

### 1.    Plaintiff is Entitled to Permanent Injunctive Relief

105.    "A court may issue an injunction on a motion for default judgment provided that

the moving party shows that (1) it is entitled to injunctive relief under the applicable statute and

(2) it meets the prerequisites for the issuance of an injunction." *Gucci*, 678 F. Supp. 2d at 120

(citation omitted).

106.    The Lanham Act, the Copyright Act, the ACPA, N.Y. Gen. Bus. Law 360-*l*, and New York common law all provide the power to grant injunctions, and the first prong is therefore satisfied. *See* 15 U.S.C. § 1116; 17 U.S.C. § 502; 15 U.S.C. § 1125(d); N.Y. Gen. Bus. L. § 360-*l*.

107.    As to the second prong, "to obtain a permanent injunction," plaintiff "must demonstrate (1) actual success on the merits and (2) irreparable harm." *Gucci*, 678 F. Supp. 2d at 120 (citation omitted).

*108.*    First, Plaintiff has "established success on the merits because the defendants' default constitutes an admission of liability." *Id.*

109.    Second, with regard to Plaintiff's trademark claims, Congress amended the Lanham Act in 2020 to provide: "A plaintiff . . . shall be entitled to a rebuttable presumption of irreparable harm upon a finding of" trademark infringement or unfair competition "in the case of a motion for a permanent injunction." 15 U.S.C. § 1116(a); *see Vineyard House, LLC v. Constellation Brands U.S. Ops., Inc.*, 515 F. Supp. 3d 1061, 1082 n.16 (N.D. Cal. 2021).

110.    Moreover, Plaintiff has demonstrated that Defendants' trademark infringement will continue, and even worsen, absent an injunction, and will harm "the goodwill symbolized by the Yellowstone Marks, and the reputation for quality that they embody." Compl. ¶ 81; Flemming Decl. ¶ 4, Ex. 1; *Spin Master Ltd. v. 158*, 463 F. Supp. 3d 348, 376 (S.D.N.Y. 2020) ("Here, there is a strong probability that, absent an injunction, Defaulting Defendants will continue to infringe........ Monetary damages are also inadequate to compensate Plaintiffs for the reputational harm they have suffered and may continue to suffer.").

111.    With regard to Plaintiff's copyright claims, irreparable harm is established because, "in the absence of a permanent injunction, Defendants may continue to" copy the

27

Works, "thus preventing Plaintiffs from controlling the distribution of" the Works and derivatives thereof, "and recovering associated profits." *McGraw-Hill Global Education Holdings, LLC v. Khan*, 323 F. Supp. 3d 488, 500 (S.D.N.Y. 2018); *see also Zlozower v. Barlotta*, No. 11-CV-1555 (RER), 2012 WL 13098709, at *7 (E.D.N.Y. Apr. 3, 2012) (finding irreparable harm where "it is likely that Defendant will continue to infringe Plaintiff's copyright in the absence of an injunction").

112.    Thus, Plaintiff has established irreparable harm.

113.    Defendants, on the other hand, would not be harmed by an injunction because it "is axiomatic that an infringer . . . cannot complain about the loss of ability to offer its infringing product." *WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275, 287 (2d Cir. 2012).

114.    And "the public interest will be served by enjoining the infringement of a [work] protected by copyright." *Gogo Apparel, Inc. v. Daruk Imports, Inc.*, No. 1:19-cv-05701 (LGS) (SDA), 2020 WL 4274793, at *3 (S.D.N.Y. June 11, 2020); *see also N.Y.C. Triathlon, LLC v. Triathlon Club, Inc.*, 704 F. Supp. 2d 305, 344 (S.D.N.Y. 2010) (in trademark cases, "the public has an interest in not being deceived—in being assured that the mark it associates with a product is not attached to goods of unknown origin and quality.").

115.    The scope of the injunctive relief articulated below is also proper, as the injunction tracks the language of the relevant statutes. In addition, "[b]oth the Lanham Act and Copyright Act provide for the delivery and destruction of infringing products." *Triangl Grp. Ltd.*, 2017 WL 2829752, at *10 (citing 15 U.S.C. § 1118 and 17 U.S.C. § 503(b)).

116.    Finally, the ACPA permits a court to order "the transfer of the domain name" from the violating party "to the owner of the mark." 15 U.S.C. § 1125(d)(1)(C).

28

117.     Such relief is proper here not only because Defendants have violated the ACPA,

but because they are likely "to continue using the Infringing Domain name[s]." *Northwell*

*Health, Inc. v. Northwell Staffing Agency, LLC*, No. CV 17-1611 (DRH) (AKT), 2018 WL

1525803, at *11 (E.D.N.Y. Mar. 1, 2018); *Sporty's Farm L.L.C. v. Sportsman's Market, Inc.*,

202 F.3d 489, 500 (2d Cir. 2000) (affirming order to transfer domain name).

118.     Accordingly, Plaintiff is entitled to the injunctive relief articulated below.

## 2.     Plaintiff is Entitled to Statutory Damages for Defendants' Copyright Infringement

119.     The Copyright Act provides that an owner "may elect" to recover "statutory

damages for all infringements involved in the action, with respect to any one work . . . in a sum

of not less than $750 or more than $30,000 as the court considers just." 17 U.S.C. § 504(c)(1).

120.     But in cases of "willful" copyright infringement, "the court in its discretion may

increase the award of statutory damages to a sum of not more than $150,000." *Id.* § 504(c)(2).

121.     Here, each episode of the Series has been registered separately with the Copyright

Office and is considered a separate "work." *Twin Peaks Prod., Inc. v. Publ'ns Int'l, Ltd.*, 996

F.2d 1366, 1381 (2d Cir. 1993) (separately registered "televised episodes" are each separate

"works" for purpose of statutory damages).

122.     Defendants have infringed at least seventeen of the Works. Declaration of Laurie

Dillon ¶ 2.

123.     And because Defendants' infringement was—and continues to be—willful,

Plaintiff is entitled to $150,000 per infringed work, for a total of $2,550,000.

124.     "When determining the amount of statutory damages to award for copyright

infringement, courts consider: (1) the infringer's state of mind; (2) the expenses saved, and

profits earned, by the infringer; (3) the revenue lost by the copyright holder; (4) the deterrent

effect on the infringer and third parties; (5) the infringer's cooperation in providing evidence concerning the value of the infringing material; and (6) the conduct and attitude of the parties." *Int'l Diamond Importers Inc. v. Twin Star Jewelry Grp., LLC*, No. 15-cv-9265 (LGS) (KNF), 2018 WL 1831866, at \*3 (S.D.N.Y. Feb. 27, 2018) (citation omitted). Each of these factors weighs in favor of awarding the maximum amount of statutory damages here.

125.     First, there is ample evidence of willfulness, including Defendants' own claim of copyright protection as to images stolen from the Series, as well as Defendants' decision to add new infringing materials to the Infringing Websites and add back previously removed infringing materials, and to evade Plaintiff's takedown notices after the Complaint was filed. *See* Compl. ¶ 70; Flemming Decl. ¶¶ 5-6; *Software Freedom Conservancy, Inc. v. Best Buy Co.*, No. 09 CIV. 10155 (SAS), 2010 WL 2985320, at \*3 (S.D.N.Y. July 27, 2010) ("After being notified of its unlawful activity, Westinghouse knowingly continued distributing the BusyBox software in violation of Plaintiffs' copyright. That is the very definition of willful infringement.").

126.     Second, "as a result of [Defendants'] default, [Defendants'] expenses saved and profits earned cannot be ascertained and the plaintiff's revenue lost cannot be ascertained with a reasonable degree of certainty." *Twin Star Jewelry*, 2018 WL 1831866, at \*3.

127.     Third, Defendants have not cooperated at all—whether with Plaintiff or with the Court.

128.     And fourth, awarding the maximum statutory damages would deter Defendants and third parties from using Plaintiff's copyrights to sell knock-off merchandise in the future. *See Best Buy Co.*, 2010 WL 2985320, at \*3 n.41 ("Relief in the form of treble damages is common, especially where damages are not merely compensatory, but also serve a deterrent function.").

30

129.     Plaintiff also seeks the maximum statutory damages award for each of the domain names registered in violation of the ACPA.  Proposed Default Judgment and Permanent Injunction ¶ 129.

130.     The ACPA provides for statutory damages, allowing a plaintiff to recover "an amount of not less than $1,000 and not more than $100,000 per domain name, as the court considers just." 15 U.S.C. § 1117(d).

131.     Courts considering the amount of statutory damages in ACPA cases rely upon the same factors used in copyright cases. *Diesel S.P.A. v. Does*, No. 14-CV-4592 (KMW), 2016 WL 96171, at *12 (S.D.N.Y. Jan. 8, 2016).

132.     The Court does not believe the maximum award is appropriate here, since the statutory damages awarded for copyright infringement account for the actual harm Plaintiff has suffered. The Court concludes $10,000 in statutory damages for each domain name is appropriate to meet the purposes of the statute, given evidence that defendants continued their offending behavior after the lawsuit commenced. *See Experience Hendrix, L.L.C. v. Pitsicalis,* No. 17-CIV-1927-PAE-GWG, 2020 WL 3564485, at *13 (S.D.N.Y. July 1, 2020), report and recommendation adopted sub nom. *Experience Hendrix, LLC v. Hendrix, No.* 17-CIV-1927-PAE-GWG, 2020 WL 4261818 (S.D.N.Y. July 24, 2020) (denying the request for maximum statutory damages and reducing the award to $10,000 per domain registration).

133.     Thus, Plaintiff is entitled to $20,000 in statutory damages in connection with its ACPA claims: i.e., $10,000 per domain name.

### 3.     Plaintiff is not Entitled to Attorney's Fees

134.     In cases of "willful" copyright infringement, "the Court may award fees pursuant to 17 U.S.C. § 505 of the Copyright Act." *Hounddog Prods, L.L.C. v. Empire Film Grp., Inc.*, 826 F. Supp. 2d 619, 634 (S.D.N.Y. 2011).

135.   The same is true in trademark cases. *See Yahoo! Inc. v. XYZ Cos.*, 872 F. Supp. 2d 300, 309 (S.D.N.Y. Dec. 5, 2011) (in "exceptional cases—generally, those trademark infringement cases in which infringement is willful," a plaintiff may recover fees).

136.   Merely defaulting is insufficient to make a case exceptional. *See Travel Leaders Grp., LLC v. Corley*, 2019 WL 6647319, at *14 (S.D.N.Y. Dec. 5, 2019) ("Failing to answer a complaint does not constitute unreasonable litigation conduct; it is simply the absence of litigation conduct. Indeed, a default is a boon to the plaintiff, relieving it of the need to prove liability for the claims alleged in the complaint.") (internal citations and quotation marks omitted).

137.   The Court does not find exceptional circumstances warranting an award of attorney's fees. Therefore, Plaintiff's request for such relief is denied.

### 4.     Plaintiff is Entitled to Post-Judgment Interest

138.   "The Court must award post-judgment interest on any money judgment recovered in a civil case," measured "'from the date of the entry of the judgment, at a rate equal to the weekly average 1–year constant maturity Treasury yield . . . for the calendar week preceding the date of the judgment,' 'computed daily to the date of payment' and 'compounded annually.'" *Rovio Ent., Ltd. v. Allstar Vending, Inc.*, 97 F. Supp. 3d 536, 546 (S.D.N.Y. 2015) (quoting 28

U.S.C. § 1961(a)-(b)).

139.   Thus, Plaintiff is entitled to post-judgment interest calculated in the above manner.

### III.     ORDER OF JUDGMENT

Good cause appearing, it is hereby ordered and adjudged as follows.

140.   Defendants shall pay to Plaintiff $2,570,000 in statutory damages and are jointly and severally liable for that amount;

141.   Defendants shall pay to Plaintiff post-judgment interest on the above amounts at a rate equal to the weekly average 1–year constant maturity Treasury yield for the calendar week preceding the date of the judgment, computed daily to the date of payment and compounded annually;

142.   Commencing on the "So Ordered" date of this Judgment and Permanent Injunction, Defendants and all of their agents, officers, employees, representatives, successors, assigns, attorneys, and all other persons acting for, with, by through or under authority from

Defendants, or in concert or participation with Defendants, and each of them, are immediately and permanently enjoined from:

      a.    using the Yellowstone Marks or any other copy, reproduction, colorable imitation, or simulation of the Yellowstone Marks in any domain name, on any website, or on or in connection with the marketing, promotion, advertising, sale, or offering for sale of clothing, footwear, or accessories;

      b.    registering or using any domain name containing confusingly similar imitations of the Yellowstone Marks;

      c.    using, reproducing, or displaying the Works or any copyrightable material related thereto in any manner or in any medium, including on any website, social media page, or advertisement; and

      d.    aiding, assisting, or abetting any other person or entity in doing any act prohibited by the foregoing subparagraphs, including, but not limited to, selling, assigning, or transferring the Infringing Domains other than as ordered below;

143.   Defendants shall, within ten days of the "So Ordered" date below, deliver up for impoundment and for destruction, all clothing, footwear, accessories, signs, advertising, sample books, promotional materials, or other materials in the possession, custody, or control of Defendants that bear confusingly similar imitations of the Yellowstone Marks;

144.   Defendants and their agents, including registrars, shall, within ten days of the "So Ordered" date below, take all reasonable steps to effectuate the transfer of the Infringing

Domains, and any other domain names owned or controlled by Defendants or those acting in concert with them containing confusingly similar imitations of the Yellowstone Marks; and

    145.   Defendants are jointly and severally liable for all of the foregoing relief.

**IT IS SO ORDERED**.

DATED:   November 2, 2021

                                    Louis L. Stanton

                                 Honorable Louis L. Stanton